**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Hon. Robert B. Kugler** |
| | : | |
| | : | **Criminal No. 06-699 (RBK)** |
| **v.** | : | |
| | : | |
| | : | |
| **STEVEN GANTT, et. al.** | : | **NOTICE OF MOTION** |

To:    Frederick W. Klepp, Esq.       John F. Renner, Esq.
        402 Park Boulevard            12000 Lincoln Drive, West
        Cherry Hill, New Jersey 08002    Suite 401
        **Attorney for Steven Gantt**      Marlton, New Jersey 08053
                                      **Attorney for Kevin Taylor**

PLEASE TAKE NOTICE that on a date and time to be determined by the Court, at Mitchell H. Cohen Courthouse, One John F. Gerry Plaza, Camden, New Jersey, 08101, at Courtroom 4D, the United States of America will move before the Honorable Robert B. Kugler, United States District Judge, for the admission of certain evidence pursuant to Rule 404(b) of the Federal Rules of Evidence.  The United States will rely upon the Memorandum of Law submitted to the Court under separate cover.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
United States Attorney

s/Jacqueline M. Carle
By: Jacqueline M. Carle
James P. Lynch
Assistant U.S. Attorneys

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Hon. Robert B. Kugler** |
| **v.** | : | |
| | : | **Criminal No. 06-699(RBK)** |
| | : | |
| **STEVEN GANTT, et. al.** | : | |

**GOVERNMENT'S MOTION IN LIMINE FOR ADMISSION OF EVIDENCE**

THE UNITED STATES, by its attorney, CHRISTOPHER J. CHRISTIE, United States

Attorney, and **Jacqueline M. Carle and James P. Lynch,** Assistant United States Attorneys,

moves *in limine* for the admission of certain evidence described in the accompanying

Memorandum of Law in support of this motion.

WHEREFORE, for reasons set forth in the accompanying Memorandum of Law, the

government respectfully requests that the Court enter an ORDER in the form attached.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
United States Attorney

s/ Jacqueline M. Carle
By: Jacqueline M. Carle
James P. Lynch
Assistant U.S. Attorneys

Date:   November 5, 2007

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Hon. Robert B. Kugler** |
| **v.** | : | |
| | : | **Criminal No. 06-699(RBK)** |
| | : | |
| **STEVEN GANTT, et. al.** | : | |

**<u>ORDER</u>**

AND NOW, this      day of November, 2007, upon consideration of the government's

Motion for Admission of Evidence, the defendant's response thereto, and oral argument from the

parties, the Court hereby ORDERS that the following evidence (as more fully described in the

government's Memorandum of Law) is admissible at the trial of this case:

1.  Evidence concerning the defendant's previous spree of bank robberies in 1998.

Specifically, evidence concerning robberies on the following dates:  May 22, 1998, May 30,

1998, June 19, 1998, July 15, 1998, July 27, 1998, August 5, 1998, August 19, 1998, August 31,

1998, September 16, 1998, September 19, 1998, September 25, 1998, September 30, 1998, and

October 14, 1998.  This evidence is relevant and admissible, pursuant to Fed. R. Evid. 404(b), to

establish defendant's identity and plan in connection with the crimes charged in the Second

Superseding Indictment.

The Court has determined, after balancing the probative value of this evidence against potential unfair prejudice, pursuant to Fed. R. Evid. 403, that such prejudice, if any, does not substantially outweigh the probative value of this evidence.

SO ORDERED.


_____
HON. ROBERT B. KUGLER
United States District Court Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Hon. Robert B. Kugler** |
| **v.** | : | |
| | : | **Criminal No. 06-699(RBK)** |
| | : | |
| **STEVEN GANTT, et. al.** | : | |

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION IN LIMINE FOR ADMISSION OF EVIDENCE**

In accordance with Federal Rule of Evidence 404(b), the government submits this Memorandum of Law in Support of its Motion for Admission of Evidence. This motion: (1) establishes that the government has met its pre-trial disclosure obligation under Fed. R. Evid. 404(b); and (2) seeks a decision by the Court prior to trial whether, and to what extent, the proffered evidence will be admitted so as to avoid any surprise at trial.

**THE SECOND SUPERSEDING INDICTMENT**

On or about June 26, 2007, the grand jury returned a 17-count second superseding indictment (hereafter, the "Indictment,") charging defendant Steven Gantt and defendant Kevin Taylor with violations of Title 18, United States Code, Section 1951(a), Title 18, United States Code, Section 2113(d), and Title 18, United States Code, Section 924(c).

**THE PROFFERED EVIDENCE**

The government seeks, for limited purposes, identified herein, the admission against defendant Steven Gantt only of evidence of Gantt's previous bank robberies in South Jersey in 1998 and his testimony as a cooperator in that case at trial.  Gantt confessed to, and was

1

convicted of, these robberies.  Gantt pled guilty before the Honorable Alfred J. Lechner, Jr. on

January 19, 1999.  He received a sentence of 96 months after Judge Lechner granted the

Government's Motion for a Downward Departure under United States Sentencing Guideline

Section 5K1.1.  The government seeks to introduce the facts of these robberies to establish

Gantt's identity as one of the robbers in this case and his plan of action in committing the instant

robberies.  The Government will propose appropriate limiting instructions regarding this

evidence, including the purposes for which it may be considered by the jury against defendant

Gantt, and that the jury may not consider the evidence for any purpose against defendant Taylor.

**Gantt's Involvement in the 1998 Bank Robbery Spree**

Steven Gantt robbed at least thirteen (13) banks in 1998 using a specific method that he

described in his confession, proffers with the government, and testimony at the trial of his co-

conspirators in that robbery spree.  Typically, Gantt recruited one or two accomplices who

carried guns, he surveilled a target bank in advance, he stole a car to use for the get-away, and all

of the robbers wore ski-masks and gloves to hide their identities.  Once inside the bank, Gantt

himself vaulted the counter and took cash from the teller drawers while his accomplice(s)

maintained control of the lobby area of the bank.  One or more of the robbers brandished

firearms to control the victim tellers and customers.  The robbers did not seek money from the

vault and exited the bank in less than two minutes.  Afterwards, Gantt and his accomplices fled

in the previously stolen car (often a Honda Accord), abandoned the car nearby, and drove

another vehicle known as a "switch car" to a location to divide the robbery proceeds.  The 1998

spree of bank robberies lasted several weeks and, with one exception, included banks only in the

greater Camden area. The specifics of these robberies are as follows:

1.    **May 22, 1998**

Steven Gantt admitted to robbing the Summit Bank in Clementon, New Jersey, alone.  He wore gloves to avoid leaving fingerprints behind and a ski-mask to avoid being otherwise identified.  Gantt vaulted the counter, brandished a simulated firearm, and took approximately $4,164 from the teller drawers.  Gantt fled the bank in a gold Honda Accord that he had stolen in anticipation of the bank robbery.  He drove the stolen vehicle to a nearby location where he previously parked his own vehicle.  Once there, he abandoned the stolen car and left the scene in his vehicle.

2.    **May 30, 1998**

Gantt also admitted to robbing the Bank of Gloucester County in Turnersville, New Jersey.  A few days prior to the bank robbery, Gantt entered the Bank of Gloucester County to determine if there were any security guards inside.  On the day of the robbery, Gantt wore gloves and a  ski mask to shield his identity.  He vaulted the counter with a bag and brandished a simulated firearm, taking approximately $10,476 from the teller drawers.  Gantt fled the bank in a tan Honda Accord that he had stolen in anticipation of the bank robbery.  He drove the stolen vehicle to a nearby location where he previously parked his own vehicle.  Once there, he abandoned the stolen car and left the scene in his vehicle.

3.    **June 19, 1998**

Gantt admitted that he and one associate, Keith Mathis, robbed the First Union Bank in Blackwood, New Jersey.  Gantt further admitted that he recruited Mathis,

3

provided him with a mask and gloves, and selected the bank himself.  Both men wore gloves and ski masks to shield their identities.  Gantt vaulted the counter with a bag, and took approximately $17,863 from the teller drawers.  Mathis meanwhile brandished a firearm and controlled the lobby area.  Within minutes, the robbery was complete.  Both men fled in a blue Honda Accord Gantt had stolen in anticipation of the bank robbery.  The men drove the stolen vehicle to a predetermined "switch" location where they abandoned the stolen vehicle and left in another car.

4.      **July 15, 1998**

Gantt admitted that he and two associates, Keith Mathis and Jeffrey Seaberry, robbed the Commerce Bank in Stratford, New Jersey.  Gantt further admitted that he recruited Jeffrey Seaberry to rob the bank and provided him with a mask.  All three men wore gloves and ski masks to shield their identities.  Gantt and Seaberry vaulted the counter and took approximately $5,185 from the teller drawers.  Mathis brandished a firearm and controlled the lobby area.  The men fled in a white Buick Park Avenue stolen by Gantt in anticipation of the bank robbery.  They drove the stolen vehicle to a predetermined "switch" location where they abandoned the stolen vehicle and left in another car.

5.      **July 27, 1998**

Gantt admitted that he and one associate, Keith Mathis, robbed the First Union Bank in Cherry Hill, New Jersey.  The men wore gloves and ski masks to shield their identities.  Gantt vaulted the counter and took approximately $29,525 from

4

the teller drawers.  Mathis brandished a firearm and controlled the lobby area.

Both men fled in a burgundy Cadillac Coupe Deville stolen by Gantt and Mathis

in anticipation of the bank robbery.  The men drove the stolen vehicle to a

predetermined "switch" location where they abandoned the stolen vehicle and left

in another car.

6.      **August 5, 1998**

Gantt admitted that he and two associates, Keith Mathis and Jeffrey Seaberry,

robbed the Summit Bank in Deptford, New Jersey.  The men wore gloves and ski

masks to shield their identities. Gantt vaulted the counter and took approximately

$7,353 from the teller drawers.  Mathis brandished a firearm and controlled the

lobby area along with Seaberry.  The men fled in a silver Oldsmobile stolen by

Gantt in anticipation of the bank robbery.  The men drove the stolen vehicle to a

predetermined "switch" location where they abandoned the stolen vehicle and left

in another car.

7.      **August 19, 1998**

Gantt admitted that he and two associates, Keith Mathis and an individual known

to Gantt as "Mo," robbed the Corestates Bank in Marlton, New Jersey.  Gantt and

Mathis entered the bank wearing gloves and ski masks to shield their identities.

Gantt vaulted the counter and took approximately $7,890 from the teller drawers.

Mathis brandished a firearm and controlled the lobby area.  The men left in a

vehicle parked in a lot adjacent to the bank that was driven by "Mo."

5

8.    **<u>August 31, 1998</u>**

Gantt admitted that he and two associates, Keith Mathis and Jeffrey Seaberry, robbed the Mellon Bank in Harrisburg, Pennsylvania.  The men wore gloves and ski masks to shield their identities.  Gantt vaulted the counter and took approximately $6,986 from the teller drawers.  The robbers used simulated weapons to control the lobby area.  All three men fled in a gold Honda Accord stolen by Gantt in anticipation of the bank robbery.  The men drove the stolen vehicle to a predetermined "switch" location where they abandoned the stolen vehicle and left in another car.

9.    **<u>September 16, 1998</u>**

Gantt admitted that he and two associates, Keith Mathis and Jeffrey Seaberry, robbed the Woodstown National Bank in Sewell, New Jersey.  The men wore gloves and ski masks to shield their identities.  The men vaulted the counter and took approximately $5,872 from the teller drawers.  Gantt and Mathis brandished simulated firearms that Gantt previously obtained.  The men fled in a station wagon stolen by Gantt and Mathis in anticipation of the bank robbery.  The men drove the stolen vehicle to a predetermined "switch" location where they abandoned the stolen vehicle and left in another car.

10.    **<u>September 19, 1998</u>**

Gantt admitted that he and two associates, Keith Mathis and Jeffrey Seaberry, robbed the Corestates Bank in Deptford, New Jersey.  The men wore gloves and ski masks to shield their identities.  Gantt and Seaberry vaulted the counter and

6

took approximately $5,872 from the teller drawers.  Mathis brandished a firearm and controlled the lobby area along with Seaberry.  The men fled in a Pontiac stolen by Gantt in anticipation of the bank robbery.  The men drove the stolen vehicle to a predetermined "switch" location where they abandoned the stolen vehicle and left in another car.

11.     **September 25, 1998**

Gantt admitted that he and two associates, Keith Mathis and Gantt's girlfriend, Gloria Williams, robbed the Summit Bank in Mt. Laurel, New Jersey.  The men wore gloves and ski masks to shield their identities.  Gantt vaulted the counter and took approximately $10,945 from the teller drawers.  Mathis brandished a firearm and controlled the lobby area.  Williams remained in a vehicle in a parking lot adjacent to the bank and drove the men from the robbery.

12.     **September 30, 1998 - (foiled robbery)**

Gantt admitted that he and two associates, Keith Mathis and Jeffrey Seaberry, robbed the Equity National Bank in Atco, New Jersey.  The men wore gloves and ski masks to shield their identities.  Gantt and at least one associate vaulted the counter and took approximately $28,007 from the teller drawers.  Mathis brandished a firearm and controlled the lobby area along with Seaberry.  Ultimately, the men were unsuccessful due to the fact that a dye pack exploded in the bag of money taken by Gantt.  The robbers discarded the bag of money and fled in a Honda Accord stolen by Gantt in anticipation of the bank robbery.  The men drove the stolen vehicle to a predetermined "switch" location where they

abandoned the stolen vehicle and left in another car.

13.   **September 30, 1998 (completed robbery)**

Also on September 30, 1998, Gantt admitted that he and two associates, Keith Mathis and Jeffrey Seaberry robbed the Farmer's and Mechanic's Bank in Willingboro, New Jersey.  The men wore gloves and ski masks to shield their identities.  Gantt vaulted the counter and took approximately $22,628 from the teller drawers.  Mathis brandished a firearm and controlled the lobby area along with Seaberry.  The men fled in another Honda Accord stolen by Gantt in anticipation of the bank robbery.  The men drove the stolen vehicle to a predetermined "switch" location where they abandoned the stolen vehicle and left in another car.

14.   **October 14, 1998**

Gantt and two associates, Keith Mathis and Jeffrey Seaberry, robbed the Sun National Bank in Maple Shade**,** New Jersey. Prior to the robbery, Gantt and his associates surveilled the bank and specifically looked for security glass at the teller windows.  On the day of the robbery, the men wore ski masks and gloves to shield their identities.  Gantt and Seaberry vaulted the counter and stole approximately $7,991 from the tellers.  The three men fled the bank and drove away in a vehicle that they parked in a lot adjacent to the bank.  As the robbers drove from the bank, a local police officer pursued them in a marked patrol unit.  All three men exited the vehicle during the pursuit and fled on foot.  Gantt turned himself in to authorities the following day.

8

The government seeks to admit this evidence to establish Gantt's identity and plan. Specifically, the government seeks to show the particular  method of bank robbery, and to allow the jury to compare Gantt's method used in the 1998 bank robberies to the method employed in the present case.  The proffered evidence is highly probative as to identity and plan, permitting the jury to identify Gantt, who wore a ski mask during the 2005-2006 bank robberies, by Gantt's *modus operandi* from his previous bank robberies.

### 2005-2006 Bank Robbery Spree and Related Testimony

Steven Gantt is charged with robbing nine banks from on or about December 2, 2005, to on or about August 1, 2006, using a virtually identical method to that used in the 1998 bank robbery spree described above.  The government intends to show that Gantt recruited accomplices, namely Walter Johnson and Kevin Taylor, who carried guns.  Furthermore, Gantt surveilled a target bank in advance and stole a car to use as the get-away vehicle.  In addition, the robbers donned ski-masks and gloves before robbing the target banks during business hours. Once inside the bank, Gantt vaulted the counter and took cash from the teller drawers while his accomplice(s) maintained control of the lobby area of the bank.  Firearms were brandished by his accomplice(s) to control the crowd.  The robbers did not seek money from the vault and exited the bank in less than two minutes. Afterwards, Gantt and his accomplices fled in the stolen car - frequently a Honda Accord - abandoned the stolen car nearby, and drove another vehicle known as a "switch car" to a location to divide the robbery proceeds.  The 2005-2006 spree of  robberies also occurred in the greater Camden area, with one exception.

The government anticipates calling Walter Johnson as a witness at trial.  The proffered evidence will corroborate the testimony of Walter Johnson who pleaded guilty to participating in

seven of the nine bank robberies set forth in the Indictment along with Steven Gantt and usually with Kevin Taylor.  Further, the proffered evidence will refute any defense claim of alibi or mistaken identity and should, therefore, be admitted.

The specifics of the bank robberies committed in the instant case are as follows:

1.   **December 2, 2005**

Gantt, along with co-defendants Kevin Taylor and Walter Johnson, robbed the Commerce Bank located in Bellmawr, New Jersey, of approximately $12,129. Johnson will testify that the bank was selected by Gantt.  Johnson will further testify that Gantt stole a green Honda Accord in anticipation of the robbery.  On the day of the robbery, all three robbers wore dark clothing, ski masks, and gloves to hide their identities.  The robbers drove up to the bank in the stolen car and ran into the bank.  Taylor and Johnson brandished guns and controlled the employees and customers of the bank, while Gantt vaulted the counter and retrieved money from the teller drawers.  The men fled in the stolen Honda and drove to a predetermined "switch" location where they abandoned the stolen vehicle and left in another car.

2.   **December 15, 2006**

Gantt, along with co-defendant Kevin Taylor, robbed a Commerce Bank located in Gloucester Township, New Jersey, of approximately $25,963.  Johnson will testify that he did not commit this particular bank robbery, although Gantt confessed to Johnson that Gantt and Taylor committed the robbery.  On the day of the robbery, the robbers wore dark clothing, ski masks, and gloves to hide their

10

identities.  Taylor brandished a gun and controlled the employees and customers of the bank, while Gantt vaulted the counter and retrieved money from the teller drawers.  The men fled in the green Kia.  A witness followed the vehicle, but stopped his pursuit when he observed police activity.  That getaway vehicle was not located by law enforcement officials.

**3.**      **February 2, 2006**

Gantt, along with co-defendants Kevin Taylor and Walter Johnson, robbed the Commerce Bank located in Bellmawr, New Jersey, of approximately $12,845.  Johnson will testify that the bank was selected by Gantt.  Johnson will further testify that Gantt stole a green Honda Accord in anticipation of the robbery.  On the day of the robbery, all three robbers wore dark clothing, ski masks, and gloves to hide their identities.  The robbers drove up to the bank in the stolen car and ran into the bank.  Taylor and Johnson brandished guns and controlled the employees and customers of the bank, while Gantt vaulted the counter and retrieved money from the teller drawers.  The men fled in the stolen Honda and drove to a predetermined "switch" location where they abandoned the stolen vehicle and left in another car.

**4.**      **March 7, 2006**

Gantt, along with co-defendants Kevin Taylor and Walter Johnson, robbed a Commerce Bank located in Cherry Hill, New Jersey, of approximately $2,226.  Johnson will testify that the bank was selected by Gantt.  Johnson will further testify that Gantt stole a silver Honda Accord in anticipation of the robbery.  On

11

the day of the robbery, all three robbers wore dark clothing, ski masks, and gloves to hide their identities.  The robbers drove up to the bank in the stolen car and ran into the bank.  Taylor and Johnson brandished guns and controlled the employees and customers of the bank, while Gantt vaulted the counter and retrieved money from the teller drawers.  The men fled in the stolen Honda and drove to a predetermined "switch" location where they abandoned the stolen vehicle and left in another car.

5.     **March 25, 2006**

Gantt, along with Walter Johnson, robbed the Commerce Bank located in Camden, New Jersey of approximately $12,350.[1]  Johnson will testify that the bank was selected by Gantt.  Johnson will further testify that Gantt stole a green Honda Accord in anticipation of the robbery.  On the day of the robbery, Gantt and Johnson wore dark clothing, ski masks, and gloves to hide their identities. The two men drove up to the bank in the stolen car and ran into the bank. Johnson brandished a gun and controlled the employees and customers of the bank, while Gantt vaulted the counter and retrieved money from the teller drawers.  The men fled in the stolen Honda and drove to a predetermined "switch" location where they abandoned the stolen vehicle and left in another car.

---

[1]Ultimately, the robbers did not realize a profit from this particular bank robbery due to the fact that a dye pack exploded in the bag of money taken by Gantt.  The evidence indicates, and Walter Johnson will testify at trial, that the bag of money was thrown out of the stolen vehicle after the dye pack exploded.

12

6.      **April 22, 2006**

Gantt, along with Walter Johnson, robbed the PNC Bank located in Cherry Hill, New Jersey of approximately $20,500.  Johnson will testify that the bank was selected by Gantt.  Johnson will further testify that Gantt drove his own vehicle to the bank.  Witnesses from the bank, as well as a bank surveillance photograph, identified the getaway vehicle as one consistent in appearance with a vehicle associated with Gantt.  On the day of the robbery, Gantt and Johnson wore dark clothing, ski masks, and gloves to hide their identities.  The two men drove up to the bank in Gantt's car and ran into the bank.  Johnson brandished a gun and controlled the employees and customers of the bank, while Gantt vaulted the counter and retrieved money from the teller drawers.  The men fled in Gantt's vehicle.

7.      **May 30, 2006**

Gantt, along with co-defendants Kevin Taylor and Walter Johnson, robbed the Commerce Bank located in Sicklerville, New Jersey, of approximately $8,900.  Johnson will testify that the bank was selected by Gantt.  Johnson will further testify that Gantt stole a Mitsubishi in anticipation of the robbery.  On the day of the robbery, all three robbers wore dark clothing, ski masks, and gloves to hide their identities.  The robbers drove up to the bank in the stolen car and ran into the bank.  Taylor and Johnson brandished guns and controlled the employees and customers of the bank, while Gantt vaulted the counter and retrieved money from the teller drawers.  Johnson will testify that during the robbery he accidentally

13

discharged his firearm into the floor of the bank.  The discharge of the weapon was confirmed by witnesses at the bank and the finding of a spent projectile by investigating officers.  The men fled in the stolen Mitsubishi and drove to a predetermined "switch" location where they abandoned the stolen vehicle and left in another car.

8.    **July 21, 2006**

Gantt, along with co-defendants Kevin Taylor and Walter Johnson, robbed the Commerce Bank located in Mount Holly, New Jersey, of approximately $4,945. Johnson will testify that the bank was selected by Gantt.  Johnson will further testify that Gantt stole a Honda Accord in anticipation of the robbery.  On the day of the robbery, all three robbers wore dark clothing, ski masks, and gloves to hide their identities.  The robbers drove up to the bank in the stolen car and ran into the bank.  Taylor and Johnson brandished guns and controlled the employees and customers of the bank, while Gantt vaulted the counter and retrieved money from the teller drawers.  The men fled in the stolen Honda and drove to a predetermined "switch" location where they abandoned the stolen vehicle and left in three separate vehicles.

9.    **August 1, 2006**

Gantt and co-defendant Kevin Taylor robbed the Commerce Bank located in York, Pennsylvania of approximately $34,000.  Johnson will testify that he did not participate in this particular bank robbery, although Gantt confessed to Johnson that Gantt and Taylor committed the robbery.  In addition, a cooperating

witness made a consensual recording of Gantt talking to Johnson about the York

bank robbery.  On the day of that particular robbery, Gantt and Johnson wore dark

clothing, ski masks, and gloves to hide their identities.  The robbers drove up to

the bank in a stolen red Honda and ran into the bank.  Taylor brandished a gun

and controlled the employees and customers of the bank, while Gantt vaulted the

counter and retrieved money from the teller drawers. The men fled in the stolen

Honda and drove to a predetermined "switch" location where they abandoned the

stolen vehicle and left in another car.

### LEGAL ARGUMENT

**Evidence of Defendant Gantt's Prior Similar Spree of "Take-over" Bank Robberies
in South Jersey is admissible Pursuant to Fed. R. Evid. 404(b) to Establish Identity**

Evidence of Steven Gantt's prior conviction for a spree of bank robberies in 1998 is

admissible under Federal Rule of Evidence 404(b).  Rule 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a
> person in order to show action in conformity therewith.  It may, however, be admissible
> for other purposes, such as proof of motive, opportunity, intent, preparation, plan,
> knowledge, *identity*, or absence of mistake or accident, provided that upon request by the
> accused, the prosecution in a criminal case shall provide reasonable notice in advance of
> trial, or during trial if the court excuses pretrial notice on good cause shown, of the
> general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b) (emphasis added).  Rather than being a means for excluding evidence, Rule

404(b) is primarily a means for including evidence that may aid the district court. U.S. v. Givan,

320 F. 3d 452,460 (3d Cir. 2003) (recognizing Rule 404(b) as a "rule of inclusion rather than

exclusion"); United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992) ("This rule is inclusive,

not exclusive, and emphasizes admissibility."), United States v. Cross, 308 F.3d 308 (3d Cir.

2002) (finding Rule 404(b) "creates a presumption of admissibility").  Specifically, the Rule is

15

"intended to emphasize admissibility of 'other crime' evidence."  United States . Sriyuth, 98

F.3d 739, 745 (3d Cir. 1996).  In fact, the Rule favors admissibility of such evidence unless it is

offered solely to show that a defendant has criminal propensities.  Huddleston v. United States,

485 U.S. 681, 688-89 (1988); see also United States v. Cruz, 326 F.3d 392, 395 (3d Cir. 2003).

In Huddleston, the Supreme Court articulated the following safeguards for admission of

such evidence:

> [T]he protection against . . . unfair prejudice emanates . . . from four . . . sources:
> first, the requirement of Rule 404(b) that the evidence be offered for a proper
> purpose; second, from the relevancy requirement of Rule 402 -- as enforced
> through Rule 104(b); third, from the assessment the trial court must make under
> Rule 403 to determine whether the probative value of the similar acts evidence is
> substantially outweighed by its potential of unfair prejudice . . .  and fourth, from
> Federal Rule of Evidence 105, which provides that the trial court shall, upon
> request, instruct the jury that the similar acts evidence is to be considered only for
> the proper purpose for which it was admitted.

Id. at 691-92 (citations and footnote omitted).  In assessing admissibility of evidence pursuant to

Rule 404(b), the district court should not weigh credibility, or determine whether the government

has proven the prior act.  Huddleston, 485 U.S. at 690.  Rather, the court should admit such

evidence so long as there is sufficient evidence from which the jury could reasonably conclude -

that: (i) the similar acts occurred; and (ii) the defendant committed them.  Id.   As shown herein,

the proffered evidence of Gantt's prior bank robbery spree is clearly admissible under the

Huddleston analysis.

**a. The proffered evidence is relevant and offered for a proper purpose.**

16

The proffered evidence easily meets the first two <u>Huddleston</u> criteria of relevance and a proper evidentiary purpose.  In the instant matter, identity will be a central issue in the case. There is no eyewitness identification of defendant Gantt as one of the bank robbers with the exception of the testimony of a cooperating co-defendant, Walter Johnson.  When the issue is related solely to identity, as it is here, district courts have overwhelmingly approved the admission of Rule 404(b) evidence.  <u>United States v. Perry</u>, 438 F.3d 642 (6th Cir. 2006).  By demonstrating the similarities of Gantt's previous bank robbery spree to the charged crimes, the proffered evidence will help establish Gantt as the perpetrator in the charged bank robberies despite the lack of eyewitness identification.  Therefore, such evidence is highly relevant and its purpose is clearly proper.

The government anticipates that Johnson's credibility will be attacked on cross-examination due to his prior criminal history and his plea agreement with the government. Under such circumstances, "[w]here the credibility of the government's witness is suspect, the need for 404(b) evidence is heightened."  <u>United States v. Abram</u>, 171 Fed.Appx.304 (2006) *citing* <u>United States v. Calderon</u>, 127 F.3d 1314, 1332 (11th Cir. 1997).

To find precedent on 404(b) evidence in bank robbery cases within the Third Circuit, the Court need look no further than <u>United States v. Mathis</u>, 264 F.3d 321 (3d Cir. 2001), which was the prosecution of Gantt's accomplice in Gantt's 1998 bank robbery spree.  In <u>Mathis</u>, the Third Circuit held that evidence of uncharged robberies by the defendant was properly admitted at trial to establish the identity of Mathis as one of the robbers. <u>Id.</u> at 329. The Court wrote:

> Mr. Gantt's testimony [was] significantly probative of Mr. Mathis's involvement in the charged conspiracy....Mr. Gantt's testimony about the uncharged robberies provided significant background information bolstering the charged conspiracy's plausibility, and

17

the risk of prejudice attending such evidence was mitigated by the opportunity for cross-examination and by the District Court's limiting instruction. Thus, we hold that the District Court did not abuse its discretion by declining to exclude Mr. Gantt's testimony.  Id.

In Mathis, Gantt testified about his involvement with Keith Mathis in a series of robberies, and the Third Circuit held that the purpose of his testimony was proper under 404(b).  Ironically, the the present case concerns the admissibility of Gantt's prior actions which were the basis for the prosecution of Keith Mathis.  The government's case in this trial will be very similar to the evidence presented in Mathis,  namely, the testimony of a co-defendant combined with 404(b) evidence of the defendant's "other crimes" to support a conviction.  In this case, however, the proffered evidence includes Gantt's guilty plea and his testimony of "other crimes" to establish his identity in the charged crimes.     Here, as in Mathis, the government seeks to introduce the proffered evidence not to impugn Gantt's character, or to suggest that he has a propensity to commit bank robberies.  Instead, the evidence is proffered to establish the identity of Gantt - who wore a ski mask during each of the charged bank robberies - by establishing his particular method of robbing banks.  The government anticipates that Gantt's defense will be mistaken identity.  Similar to Mathis, the government seeks the 404(b) evidence to counter a very specific problem that emerges from masked bank robberies: to establish *modus operandi* and the identity of the defendant.  The proffered evidence in this case is, in fact, more compelling than the 404(b) evidence admitted in Mathis.  In this case, unlike Mathis, the 404(b) evidence sought by the government involves Gantt's admissions of previous crimes and his *modus operandi*, rather than merely accusatory testimony from a co-conspirator.

The Third Circuit, as well as other courts, have admitted evidence of other crimes committed in a similarly unusual and distinctive manner.  Several courts have admitted evidence

18

of other bank robberies committed by a defendant who faces similar charges.  See United States v. Grimmette, 208 Fed.Appx. 709 (11th Cir. 2006) (admitting evidence of five prior, uncharged bank robberies to prove identity of defendant); United States v. Robinson, 161 F.3d 463 (7th Cir. 1998) (admitting evidence pertaining to another later bank robbery to which defendant pled guilty to prove identity of defendant); United States v. Washam 2007 WL 2253161 (W.D.Ky. 2007).  "If the crimes share elements that possess 'signature quality,' evidence of the 'other crime' may be admitted."   United States v. LaFlora, 146 Fed.Appx. 973, 975 (10th Cir. 2005) quoting United States v. Gutierrez, 696 F.2d 753, 755 (10th Cir. 1982).  While the other crime must be similar to the crime charged, it does not have to be identical in every detail.  See United States v. LaFlora, 146 Fed.Appx. at 975 (upholding admission of evidence of two prior bank robberies to establish identity because method of robberies was similar); United States v. Quinn, 18 F.3d 1461 (9th Cir. 1994) (admitting evidence of robberies to establish identity given that the robberies used a similar "take-over" method); United States v. Powers, 978 F.2d 354 (7th Cir. 1992) (allowing evidence of other bank robberies to establish identity where perpetrator used similar method); United States v. Sappe, 898 F.2d 878 (2d Cir.1990) (permitting evidence of similar method using toy gun allowed in bank robbery prosecution).  Nor must the defendant employ a bizarre or unique method; the defendant may utilize a series of standard tactics that, in combination, constitute an distinctive and identifiable manner. See United States v. Mack, 258 F.3d 548,554 (6th Cir. 2001) (finding a signature in an aggregation of standard tactics).


In United States v. Oman, 427 F.3d 1070 (8th Cir. 2005), the defendant challenged the admission of evidence of his two prior bank robbery convictions to prove identity.  In that case,

the prior conduct and the charged offenses involved robberies of branches of the same bank located in a grocery store where the teller was given a bag in which to place money and no weapon or face covering was used.  In addition, the charged conduct occurred approximately seven years after the prior conduct.  The <u>Oman</u> court upheld the admission of the 404(b) evidence in that case, finding the robberies to be sufficiently similar and the distance between the crimes in space and time to be acceptable.[2]

In this case, defendant Gantt's method constituted a signature because of the aggregation of numerous features of the robberies, none of which, standing alone, would amount to "signature."  The evidence is admissible because of the aggregate features similarity between robberies committed in 1998 and the robberies charged in the Indictment.  In both sprees: (1) Gantt selected a target bank in South Jersey (with one exception); (2) Gantt usually recruited one or two accomplices; (3) Gantt typically stole a car in anticipation of the bank robbery, often a Honda Accord; (4) Gantt and his accomplices drove the stolen car up to the bank and charged into the bank during business hours wearing ski masks and gloves; (5) Gantt and his accomplices ordered the bank employees and customers to the ground; (6) Gantt vaulted the counter and emptied teller drawers, while the accomplices typically controlled the lobby area; (7) Gantt and/or his accomplices never attempted to enter the bank vault; (8) Gantt and his accomplices exited the bank in under two minutes; and (9) Gantt and his accomplices abandoned the stolen car and typically drove a switch car to drive to another location to divide the take.  Most of the

---

[2]In <u>Oman</u>, the crimes charged and the prior convictions were separated by seven years, approximately the same time span in the present case.  The appellate court in <u>Oman</u>, however, noted in the opinion that the "admission of other convictions for acts committed up to thirteen years before the crime charged" was, in fact, acceptable. <u>United States v. Oman</u>, 427 F.3d at 1075 *citing* <u>United States v. Rush</u>, 240 F.3d 729, 731 (8th Cir. 2001).

2005-2006 robberies  followed the same pattern and used most of the same methods as the 1998 spree.  The aggregation of these standard tactics constitutes Gantt's signature method of robbing banks.  Furthermore, the government anticipates calling an agent from the Federal Bureau of Investigation ("FBI") who will testify that FBI statistics show that bank robberies following this particular pattern are rare in the South Jersey area.

In determining whether the proffered evidence is admissible as *modus operandi,* the court is to "focus 'not on the dissimilarities between the charged offense and the other acts evidence, but on their common characteristics.'" United States v. Moore, 115 F.3d 1348 (7th Cir. 1997) *quoting* United States v. Connelly, 874 F.2d 412, 418 (7th Cir. 1989).  Clearly, the proffered evidence and the charged crimes bear numerous common characteristics that distinguish Gantt from other criminals committing bank robberies in this area.  As a result, the proffered evidence should be admissible as *modus operandi.*

**b.    The probative value of the proffered evidence is not substantially outweighed by any possible undue prejudicial effect.**

Evidence of Gantt's previous bank robbery spree should not be excluded by operation of Federal Rule of Evidence 403, which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403 (emphasis added). United States v. Cross, 308 F.3d at p. 323.  (Relevant evidence can be excluded under Rule 403 only if its prejudicial effect substantially outweighs its probative character); United States v. Johnson, 199 F.3d 123, 128 (3rd Cir. 1999) ("In weighing the probative value of evidence against the dangers in Rule 403, the general rule is that the

balance should be struck in favor of admission.") Given the government's strenuous burden of proof in a criminal case, evidence that corroborates the testimony of an important government witness is highly probative, particularly in light of the anticipated vigorous defense attacks on the credibility of the witness.  United States v. Henthorn, 815 F.2d 302, 308 (5th Cir. 1987).

The probative value of the proffered evidence regarding Gantt's previous bank robbery spree is not substantially outweighed by unfair prejudice.  The government anticipates that Gantt will contest that he was one of the robbers in the charged crimes, therefore requiring the government to prove Gantt's identity beyond a reasonable doubt at trial.  The proffered evidence will corroborate the testimony of the only eyewitness, cooperating co-defendant Walter Johnson whose credibility is crucial to the government's case.  Johnson will testify that he directly participated with Gantt and Kevin Taylor in seven of the nine bank robberies charged in the Indictment and has knowledge of the other two bank robberies.  Johnson knew Gantt from a prison work release program that employed both men, and it was Gantt who initially approached Johnson about committing a bank robbery.  Furthermore, Johnson will testify that Gantt selected the target bank in advance and stole the get away vehicle in anticipation of the robbery.  Johnson will also testify that he, along with Gantt and Kevin Taylor, wore ski masks and gloves during the robberies to hide their identities.  Lastly, Johnson will describe the role that each defendant had inside the target banks.  Cross-examination of Johnson, who will be the subject to impeachment due to his criminal history and plea agreements with the government, as well as the Court's limiting instruction regarding the proffered evidence, will serve to appropriately safeguard Gantt's right to a fair trial.

While evidence of other crimes is always prejudicial to some extent, such evidence is not automatically barred.  The question is whether or not there is <u>unfair</u> prejudice stemming from some aspect of the previous crimes sought to be admitted.  Relevant to the admission of other crimes, the Third Circuit held that the admission of eleven prior bank robberies was not unfairly prejudicial.  <u>Mathis</u>, 264 F.3d 327; <u>see also</u> <u>United States v. McGuire</u>, 27 F.3d 457 (10th Cir. 1994) (admitting seven previous bank robberies to establish identity), <u>United States v. O'Leary</u>, 739 F.2d 135 (3d Cir. 1984) (admitting twenty previous crimes into evidence); <u>United States v. Danzey</u>, 594 F.2d 905 (2d Cir. 1979) (admitting evidence of fifteen prior bank robberies to show modus operandi). In <u>Mathis</u>, the court failed to accept any particular number of previous acts as unfairly prejudicial and specifically noting that evidence of several robberies was properly admitted "even if disproportionate to the number of charged acts" without creating undue prejudice. <u>Id</u>. at 327.

In this case, the government seeks to admit evidence of thirteen robberies that Gantt confessed to and for which he sustained a conviction.  The robberies bear many common characteristics to the bank robberies charged in the Indictment.  They were committed without gross acts of violence and bodily injury, and are therefore not akin to the facts in a violent crime where such evidence might evoke a strong emotional response. There is no significant potential for juror confusion, and virtually no risk of an uncontrollable emotional response from the jury. As such, the proffered evidence should be admitted since there is no real potential for unfair prejudice and the evidence itself is highly probative.

**c.      A limiting instruction will substantially reduce any risk of undue prejudice from the proffered evidence.**

23

The government will submit before trial a proposed limiting instruction regarding the proper uses for which the jury may consider the proffered evidence.  Such an instruction is presumptively sufficient to cure any potential prejudicial effect from the evidence of other uncharged acts.  <u>Government of Virgin Islands v. Edwards</u>, 903 F.2d 267, 270 (3d Cir. 1990); <u>see</u> <u>O'Leary</u>, 739 F.2d at 136-37 (limiting instruction "lessen[s] any possibility of prejudice" from admission of evidence appellant's 20 prior cocaine sales," even though he was charged with only one conspiracy and five substantive drug counts).

The government will not oppose the reading of the instruction during the evidentiary phase of trial, directly before and/or after the proffered evidence is admitted.  The government is also willing to echo the limiting instruction during its own summation, and tell the jury that defendant is not on trial for any crimes other than those charged in the Indictment.  Taken together, these steps should effectively eliminate the potential for any unfair prejudice.

## **CONCLUSION**

For all of the foregoing reasons, this Court should grant the government's motion *in*

*limine,* and admitted the proffered evidence.

<div style="margin-left: 50%">

Respectfully submitted,
CHRISTOPHER J. CHRISTIE
United States Attorney


s/ Jacqueline M. Carle
By: JACQUELINE M. CARLE
JAMES P. LYNCH
Assistant United States Attorney

</div>

Dated: November 5, 2007